IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FRANK SCOTT STRUNIAK, *et al.*,     )
    Plaintiffs,               )
                          )
       v.                   )       Case No. 1:15-cv-1447
                          )
LORETTA LYNCH, *et al.*,        )
    Defendants.            )

## MEMORANDUM OPINION

Plaintiffs in this immigration case challenge the denial by the United States Citizenship and Immigration Services ("USCIS")[1] of a petition for immediate relative status filed by plaintiff Frank Scott Struniak on behalf of his spouse, Aygul Minigalina. Specifically, plaintiffs argue that:

(1) the USCIS's denial of Struniak's petition was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A);

(2) the USCIS's application of certain provisions of the Adam Walsh Child Protection and Safety Act ("AWA")[2] to Struniak's petition was impermissibly retroactive;

(3) the USCIS's implementation of the AWA (i) by applying the AWA to petitioners with adult beneficiaries and (ii) by imposing a "beyond a reasonable doubt" standard of proof on petitioners to demonstrate their eligibility to petition exceeds the scope of the statutory authority, in violation of the APA, 5 U.S.C. § 706(2)(C); and

---

[1] Defendants in this action are (i) Loretta Lynch, U.S. Attorney General, (ii) Jeh Johnson, Secretary of Homeland Security, (iii) Leon Rodriguez, Director of the USCIS, (iv) Sarah Taylor, District Director for the USCIS, and (v) Kimberly Zanotti, Field Office Director for the USCIS. For ease, this Memorandum Opinion uses "USCIS" to refer to the named defendants collectively.

[2] Pub. L. 109-248, 120 Stat. 587 (2006).

(4) the USCIS's denial of Struniak's petition infringes on Struniak's
constitutionally protected liberty interest in marriage and family life, specifically
his interest in residing with his spouse in the United States.

Accordingly, plaintiffs seek (i) a declaration that the USCIS's denial of plaintiff's petition was

unlawful, (ii) a remand to the USCIS for further findings and approval of the petition, and (iii)

reasonable attorney's fees and costs under the Equal Access to Justice Act.[3]

The USCIS argues that there is no subject matter jurisdiction to review the denial of

plaintiffs' petition and that plaintiffs' arguments fail as a matter of law. Thus, the USCIS moved

to dismiss the Complaint under Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P. The matter was fully

briefed and argued orally, and is thus now ripe for disposition. For the reasons that follow, the

motion to dismiss must be granted.

## I.

## A.

At the outset, a brief overview of the relevant statutory and regulatory scheme is helpful.

In general, "any citizen of the United States claiming that an alien is entitled...to an immediate

relative status...may file a petition with the Attorney General for such classification." 8 U.S.C. §

1154(a)(1)(A)(i). Unsurprisingly, a spouse qualifies as an immediate relative for purposes of §

1154. *See* 8 U.S.C. § 1151(b)(2)(A)(i). Where, as here, a citizen seeks to obtain an immediate

relative status for his spouse, he does so by filing a Form I-130 petition with the USCIS. *See* 8

C.F.R. § 204.1(a)(1).

---

[3] *See* 28 U.S.C. § 2412(d)(1)(A) (providing for an award of fees and expenses to a party who
prevails against the United States in a civil action not sounding in tort, including on judicial
review of agency action, unless the position of the United States was substantially justified or
special circumstances make an award unjust).

Yet, Congress enacted in 2006 as part of the AWA an exception to the general rule that "any citizen" can file an I-130 petition. Specifically, "a citizen of the United States who has been convicted of a specified offense against a minor" is *not* entitled to file a petition for immediate relative status "unless the Secretary of Homeland Security, in the Secretary's sole and unreviewable discretion, determines that the citizen poses no risk to the alien with respect to whom the petition…is filed." 8 U.S.C. § 1154(a)(1)(A)(viii)(I). For purposes of this exception, a "specified offense against a minor" includes any offense against a minor that involves, *inter alia*, (i) solicitation to engage in sexual conduct, (ii) criminal sexual conduct involving a minor, or (iii) any conduct that by its nature is a sex offense against a minor. *See id.* § 1154(a)(1)(A)(viii)(II) (referencing the definition in 42 U.S.C. § 16911(7)).

Authority to adjudicate immigrant visa petitions, including Form I-130 petitions, rests with the USCIS. *See* 6 U.S.C. § 271(b)(1). This authority includes the power to "establish policies for performing" immigrant visa petition adjudications. *Id.* § 271(a)(3)(A). As relevant here, one of the "policies" of the USCIS in reviewing I-130 petitions submitted by qualifying convicted offenders under § 1154(a)(1)(A)(viii)(I) is that the burden is on the petitioner to establish beyond a reasonable doubt that he or she poses no risk to his or her beneficiary, a policy that derives from a 2007 policy memorandum from Michael Aytes, Associate Director of Domestic Operations for the USCIS ("Aytes Memorandum"). *See In re Aceijas-Quiroz*, 26 I. & N. Dec. 294, 296 n.5 (BIA 2014) (discussing the policy).

A denial of an I-130 petition is appealable to the Board of Immigration Appeals ("BIA"). *See* 8 C.F.R. § 204.2(a)(3). The BIA, however, has concluded that it lacks jurisdiction to review the USCIS's "no risk" determinations under the AWA as codified at 8 U.S.C. § 1154(a)(1)(A)(viii)(I). *See In re Aceijas-Quiroz*, 26 I. & N. Dec. at 300-01.

3

**B.**

Given this legal background, the pertinent facts here may be succinctly stated.[4] Plaintiff Struniak is a United States citizen who, in 1993, was convicted of a series of crimes in Pennsylvania state court. These convictions included qualifying offenses against minors that, under the AWA, would render Struniak ineligible to file an I-130 petition absent a showing that he poses "no risk" to the beneficiary of the petition. Specifically, the USCIS cited the following convictions as qualifying offenses:[5]

(i) Two counts of rape;

(ii) Two counts of statutory rape;

(iii) Two counts of involuntary deviate sexual intercourse;

(iv) Two counts of incest;

(v) Two counts of indecent assault;

(vi) Two counts of indecent exposure;

(vii) Two counts of simple assault;

(viii) Terrorist threats;

(ix) Two counts of corruption of minors; and

(x) Two counts of endangering welfare of children.

---

[4] For the purposes of a motion to dismiss, the facts set forth in the Complaint are assumed to be true. *See Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 827 (4th Cir. 2010). Some additional facts noted herein are derived from relevant portions of the administrative record that the Complaint incorporates by reference. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (noting that it is appropriate on a motion to dismiss to consider "documents incorporated into the complaint by reference" and "matters of which a court may take judicial notice").

[5] *See* Def'ts' Mem. Supp., Ex. A (Notice of Denial).

In February 2007, Struniak married plaintiff Minigalina, and the two have lived together in Alexandria, Virginia, since the time of their marriage. In April 2007, Struniak filed with the USCIS a Form I-130 petition on behalf of Minigalina, seeking to have Minigalina classified as an immediate relative of a U.S. citizen. Approximately one year later, plaintiffs were interviewed by USCIS officials in the USCIS district office in Washington, D.C. Shortly thereafter, the USCIS issued a request for evidence, seeking certified copies of the police and court records pertaining to Struniak's 1993 Pennsylvania convictions. This evidence was submitted. Thereafter, in September 2009, plaintiffs inquired about the status of Struniak's pending I-130 petition. Plaintiffs were advised that a decision had been made, although the decision was not then disclosed. On the advice of counsel, Minigalina *sua sponte* submitted a sworn statement to the USCIS on September 23, 2009, confirming that she was aware of Struniak's convictions.

A few months later, in January 2010, the USCIS issued a second request for evidence, this time seeking certified records confirming that Struniak successfully completed counseling or rehabilitation or, in the alternative, seeking a certified evaluation from a licensed professional assessing Struniak's level of rehabilitation and behavior modification. Accordingly, plaintiffs provided an evaluation letter from Struniak's psychologist. Six months later, in June 2010, the USCIS conducted a second interview with plaintiffs at the district office in Washington, D.C.

Approximately nine months after plaintiffs' second USCIS interview, the USCIS issued a third request for evidence along with a notice of the intent to deny Struniak's I-130 petition. The USCIS notice informed plaintiffs that it appeared that Struniak was ineligible to submit an I-130 petition because he had been convicted of a qualifying disabling offense under the AWA. Thus, the USCIS instructed Struniak that his petition would be denied unless he submitted evidence demonstrating beyond a reasonable doubt that he poses no risk to Minigalina. In August 2011,

plaintiffs responded to the USCIS notice through counsel. In support of their argument that

Struniak poses no risk to Minigalina, plaintiffs submitted:

> (i) a sworn statement by Struniak describing the mitigating circumstances surrounding his 1993 convictions and the harmonious state of his marriage;

> (ii) a sworn statement by Minigalina discussing Struniak's character and her confidence that he poses no risk to her;

> (iii) a psychological evaluation that concluded that Struniak poses no risk to Minigalina;

> (iv) a medical sexual responsiveness evaluation indicating that plaintiff has no sexual interests that pose a risk to public safety;

> (v) a research report suggesting that Struniak lacks the attributes of a future sex offender;

> (vi) a 1992 psychological evaluation finding that Struniak exhibited a positive family orientation;

> (vii) ten letters of support from family and friends;

> (viii) Struniak's conviction record;

> (ix) photographs of Struniak and Minigalina; and

> (x) a letter from Minigalina's employer attesting to her strength, independence, and self-sufficiency.

Importantly, plaintiffs did *not* submit a piece of evidence that the USCIS had specifically

requested, namely the trial transcripts from Struniak's conviction describing the nature and

circumstances of the specified offenses. Rather, plaintiffs represented to the USCIS that the full

trial transcripts were unnecessary to demonstrate Struniak's eligibility to petition on behalf of

Minigalina.

Plaintiffs' omission of the requested evidence apparently proved more problematic for

the USCIS than plaintiffs anticipated. In May 2012, the USCIS denied Struniak's I-130 petition.

In so doing, the USCIS specifically cited the fact that Struniak contends that the charges against

him and the subsequent state criminal convictions were fabrications by his former wife, and despite the guilty verdict, that he did not purposefully commit any crime. Yet, plaintiffs failed to disclose the trial transcripts providing the context to Struniak's contentions. Accordingly, the USCIS noted that without the requested transcripts, it would be difficult to conclude, beyond a reasonable doubt, that Struniak does not pose a risk to Minigalina. Because Struniak failed to prove beyond a reasonable doubt that he poses no risk to Minigalina, the USCIS concluded that he was ineligible to petition on Minigalina's behalf under the AWA.

Plaintiffs appealed the denial to the Board of Immigration Appeals ("BIA"), which dismissed the appeal for want of jurisdiction in November 2014. *See* Def'ts' Mem. Supp., Ex. B. This action followed.

## II.

The threshold question presented by this motion to dismiss is jurisdictional. Federal law generally bars judicial review of denials of discretionary relief in the immigration context. *See* 8 U.S.C. § 1252(a)(2)(B). Specifically, "no court" has jurisdiction to review any "decision or action of...the Secretary of Homeland Security the authority for which is specified...to be in the discretion of...the Secretary of Homeland Security." *Id.* § 1252(a)(2)(B)(ii). Because the "no risk" determination under § 1154(a)(1)(A)(viii)(I) is explicitly reserved the Secretary of Homeland Security's "sole and unreviewable discretion," there is appropriately no dispute between the parties that the substance of the determination is not subject to judicial review by virtue of the jurisdiction-stripping language of § 1252(a)(2)(B)(ii). There is, however, a clear dispute between the parties as to just how broadly § 1252(a)(2)(B)(ii) sweeps.[6] In this respect,

---

[6] The scope of § 1252(a)(2)(B)(ii)'s reach with respect to the USCIS's application of the AWA is an issue that has divided courts nationwide. *Compare, e.g., Bittinger v. Johnson*, No. 14-cv-1560,

7

the USCIS argues that § 1252(a)(2)(B)(ii) prevents review not only of the substantive "no risk" determination but also of the means by which the USCIS arrived at the determination in any given case *and* the generally applicable rules and policies the USCIS applied in reaching its decision. Thus, the USCIS asserts that there is no subject matter jurisdiction to review any of plaintiffs' APA claims.[7] Plaintiffs, in turn, contend that § 1252(a)(2)(B)(ii) erects no bar to judicial review whatsoever in this case. In plaintiffs' view, the USCIS never actually exercised discretion such that § 1252(a)(2)(B)(ii) is triggered, and the text of § 1252(a)(2)(B)(ii) cannot support the conclusion that legal challenges to agency practices and policies are immune to judicial review.

The first claim over which the USCIS contends there is no subject matter jurisdiction is plaintiffs' claim under APA § 706(2)(A) that the USCIS's denial of Struniak's petition was "arbitrary, capricious, [and] an abuse of discretion." Plaintiffs argue on this point that the USCIS's "no risk" finding did not involve an exercise of discretion, and as a result

---

2015 WL 3842649, at *4 (M.D. Pa. June 22, 2015) (holding that questions of law relating to the "no risk" determination are barred); *Bremer v. Johnson*, No. 13-cv-1226, 2014 WL 7238064, at *4 (W.D. Mo. Dec. 17, 2014) (same); *Beeman v. Napolitano*, No. 10-cv-803, 2011 WL 1897931, at *3-4 (D. Or. May 17, 2011) (same), *with, e.g., Suhail v. U.S. Attorney Gen.*, No. 15-cv-12595, 2015 WL 7016340, at *4 (E.D. Mich. Nov. 12, 2015) (holding that judicial review is available for legal challenges that do not target the Secretary of Homeland Security's discretionary "no risk" determination); *Burbank v. Johnson*, No. 14-cv-292, 2015 WL 4591643, at *4 (E.D. Wa. July 29, 2015) (same); *Bakran v. Johnson*, No. 15-cv-127, 2015 WL 3631746, at *4 (E.D. Pa. June 11, 2015) (same). Although the BIA has concluded that it lacks jurisdiction to review the Secretary of Homeland Security's discretionary "no risk" determination, including the imposition of a "beyond a reasonable doubt" standard, that determination was based on the language of the AWA and not the jurisdiction-stripping provision at issue here. *See In re Aceijas-Quiroz*, 26 I. & N. Dec. at 300 (noting that the BIA "do[es] not have review authority comparable to that exercised by the courts" under the APA and concluding that the AWA is the source of the limitation on the BIA's review authority).

[7] It is worth noting that the APA is not a jurisdiction-conferring statute; rather, the jurisdictional source for an action under the APA is the statute conferring general federal question jurisdiction. *See Angelex Ltd. v. United States*, 723 F.3d 500, 505 (4th Cir. 2013).

§ 1252(a)(2)(B)(ii) does not strip subject matter jurisdiction. Specifically, plaintiffs contend that the USCIS's notification of the denial of Struniak's petition reflects that the agency was not able to decide whether Struniak poses a present risk to Minigalina. In this regard, plaintiffs seize on the USCIS's language in the Notice of Denial:

> [W]ithout [the requested] trial transcripts, it would be difficult to conclude, without a reasonable doubt, that you do not pose a risk to your spouse. The transcripts would have enabled USCIS to decide whether your contention of subsequent good moral character, despite the convictions, are legitimate and would have eventually led to an assessment of no risk.

Def'ts' Mem. Supp., Ex. A at 4. In plaintiffs' view, the USCIS's conditional language ("would have") reveals that the USCIS stopped short of exercising discretion. Rather, plaintiffs suggest that the USCIS used the absence of the transcripts as a basis for denying Struniak's I-130 petition on a technicality without properly weighing the evidence plaintiffs submitted.

Plaintiffs' argument fails because plaintiffs misunderstand the nature of the USCIS's reasoning. Read in context, there can be no doubt that the USCIS made a clear and definitive determination:

> Upon review of your response and supporting evidence, USCIS finds that the evidence you submitted does not demonstrate, beyond a reasonable doubt, that you pose no risk to the safety and well-being of your beneficiary, Aygul Failovna Minigalina.

*Id.* In essence, the USCIS concluded that plaintiffs' evidence was not sufficient to pass the high bar that the USCIS imposes, namely proof beyond a reasonable doubt that Struniak does not pose a risk to Minigalina. In other words, the USCIS weighed plaintiff's evidence, and in doing so the USCIS (i) found that the evidence fell short of establishing "no risk" beyond a reasonable doubt and (ii) explained how the transcripts that the USCIS had requested, but did not receive, might have affected its analysis. Simply put, there is no basis to conclude from the face of the Notice of

Denial that the USCIS did not make a discretionary determination that is shielded from judicial review by § 1252(a)(2)(B)(ii).

Plaintiffs attempt a second bite at the jurisdictional apple by reframing their challenge not as an attack on a discretionary decision but as an attack on an arbitrary and capricious deviation from standard agency practice. That is, plaintiffs argue that the failure "to properly review the evidentiary record pursuant to [the USCIS's] own established procedures" by "ignor[ing] or discount[ing]" plaintiffs' "substantial evidence" is reviewable under the APA. Comp. ¶ 39. In support of this argument, plaintiffs rely on *INS v. Yang*, 519 U.S. 26, 32 (1996), where Justice Scalia, in *dicta*, noted that an agency's "irrational departure from [a settled] policy...*could* constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion'" (emphasis added).

Plaintiffs' reliance on *Yang* is of no avail. Indeed, the language on which plaintiffs rely is *dicta* because in *Yang* there was no "irrational departure" from agency policy. *See id.* Rather, in *Yang* in the Supreme Court drew an important distinction: construing a policy strictly and narrowly is not the same thing as disregarding the policy. *See id.* Thus, even if plaintiffs are correct that the USCIS has not given plaintiffs' evidence weight consistent with past practice, plaintiffs present no reason to believe that this constitutes a departure from settled agency practice as opposed to a strict and narrow application of the USCIS's policy that "no risk" must be proved beyond a reasonable doubt, an evidentiary standard that imposes an evidently heavy burden.[8]

---

[8] Importantly, the Complaint does not allege, nor does the record reflect, any basis from which to conclude that the weighing of evidence that occurred here was a deviation from settled agency practice. This is not surprising, as the weight afforded to evidence will inevitably vary from case to case, as different petitioners submit different quantities of evidence of varying probative

Even so, *Yang* is distinguishable on a broader and equally dispositive point, namely that *Yang* did not address an attack on an agency's weighing of evidence as part of a discretionary decision. That is precisely the type of attack plaintiffs assert here,[9] and it is precisely the kind of attack that § 1252(a)(2)(B)(ii) does not permit. A discretionary determination, such as the "no risk" determination under the AWA, is nothing more than an expression of how the evidence was weighed; the weighing of evidence is inextricably intertwined with the decision itself. At its core, the weighing of evidence is a *procedure* by which an agency reaches a decision. By contrast, *Yang* alludes to a situation in which an agency irrationally deviates from a *substantive* policy designed to guide the exercise of discretion, *e.g.,* the policy discussed in *Yang* whereby the agency disregarded entry fraud or misrepresentation in making the determination whether to grant a discretionary waiver of deportation. *See* 519 U.S. at 31-32. No such substantive policy is present here. Rather, to say that the USCIS improperly weighed evidence is to say that the USCIS abused its discretion to review the evidence, but an abuse of discretion remains an exercise of discretion all the same, albeit perhaps not a prudent one. And because the USCIS's decision resulted from an exercise of discretion reserved by statute to the Secretary of Homeland Security, § 1252(a)(2)(B)(ii) shields that decision from judicial review. *Accord Quijada-Morales v. Attorney Gen.*, 618 F. App'x 74, 76 (3d Cir. 2015) (noting that a lack of jurisdiction to review "discretionary decisions" entails a lack of jurisdiction to review the weighing of evidence in reaching those decisions).

---

quality. This reality underscores why the weighing of evidence is part of the discretionary "no risk" determination and therefore immune from judicial review under § 1252(a)(2)(B)(ii).

[9] *See* Comp. ¶ 39 ("Plaintiffs are not seeking review of USCIS's discretionary determination in regard to its 'no risk' determination, but rather, they are seeking to compel the agency to properly review the evidentiary record.").

This conclusion finds firm support in a careful parsing of the text of § 1252(a)(2)(B)(ii), an exercise the Supreme Court teaches must be performed in the context of applying jurisdiction stripping provisions. *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991) (focusing on the "critical words" of the jurisdiction stripping provision at 8 U.S.C. § 1160(e)(1) to conclude that "'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions").[10] As relevant here, § 1252(a)(2)(B) shields from judicial review certain "judgment[s], decision[s], [and] actions" of the USCIS. And the language of § 1252(a)(2)(B)(ii) provides that a discretionary "decision or action" of the Secretary of Homeland Security is not subject to judicial review only when "the authority" for the decision or action "is specified...to be in the discretion of...the Secretary of Homeland Security." The statute's plain language, therefore, requires that in order for a decision or action to fall beyond the reach of judicial review, a *statute* must state *explicitly* that the decision or action is discretionary.[11] Here, the only "decision or action" that the statute explicitly reserves to the

---

[10] Plaintiffs in *McNary* sought to challenge the legality of the interview process by which the agency conducted special agricultural worker status determinations. 498 U.S. at 487. The Supreme Court held that 8 U.S.C. § 1160(e)(1), which provides that "[t]here shall be no...judicial review of a determination respecting an application for [special agricultural worker] status" except on review of an order of exclusion or deportation, did not bar such a challenge. *See id.* at 491-92. Moreover, the Supreme Court reaffirmed that there is a "strong presumption in favor of judicial review of administrative action" that can be overcome only by "clear congressional language mandating preclusion of federal jurisdiction." *See id.* at 483-84, 498. Thus, even though *McNary* addressed a jurisdiction-stripping provision different from the one at issue in the present case, *McNary* remains instructive with respect to the analysis required when applying statutes purporting to preclude judicial review of agency action.

[11] *See* The Am. Heritage Coll. Dictionary 1307 (3d ed. 1993) (defining "specify" as "[t]o state explicitly or in detail"); Webster's II New Riverside Univ. Dictionary 1116 (1984) (defining "specify" as "[t]o state explicitly"). Although not dispositive, dictionary definitions are "valuable tools" for approximating the sense in which a linguistic community uses and understands a word and for confirming that an understanding taken as ordinary is not, in fact, idiosyncratic. *See* Caleb Nelson, Statutory Interpretation 126 (2011).

discretion of the Secretary of Homeland Security is the "no risk" determination for any given petitioner. *See* 8 U.S.C. § 1154(a)(1)(A)(viii)(I) (discretion exists to "determine[] that the citizen poses no risk"). Thus, the § 1154(a)(1)(A)(viii)(I) determination of "no risk" constitutes the relevant "decision" for purposes of § 1252(a)(2)(B)(ii).[12]

   This does not end the statutory analysis, as it is important to determine the scope of a "decision" or "action" as those words are used in § 1252(a)(2)(B)(ii)'s jurisdiction-stripping language. In making this assessment, a "fundamental canon of statutory construction" requires the identification of the "ordinary, contemporary, common meaning" of these terms. *Perrin v. United States*, 444 U.S. 37, 42 (1979). In this respect, previous decisions interpreting § 1252(a)(2)(B)(ii) have noted "the term 'action' encompasses *any* act or series of acts that is discretionary," thus rendering insulated from judicial review an entire "process," such as the process of reviewing an adjustment application. *Safadi v. Howard*, 466 F. Supp. 2d 696, 699 (E.D. Va. 2006) (citing Black's Law Dictionary (6th ed. 1990)).[13] The same result obtains as to the term "decision," which means the "passing of judgment on an issue" or refers to "reaching a conclusion or making up one's mind," both of which contemplate a *process* rather than just a *result*.[14] Thus, dictionary usage indicates that a "decision" under § 1252(a)(2)(B)(ii) entails the entire process necessary to reaching the ultimate conclusion.[15]

---

[12] *Accord* The Am. Heritage Coll. Dictionary 13 (3d ed. 1993) (defining "determine" as "to decide"); Webster's II New Riverside Univ. Dictionary 369 (1984) (same). In this sense, a determination and a decision are, for relevant purposes here, linguistically coextensive.

[13] *Accord* The Am. Heritage Coll. Dictionary 13 (3d ed. 1993) (defining "action" as "[t]he state or process of acting or doing"); Webster's II New Riverside Univ. Dictionary 76 (1984) (defining "action" as "[t]he process of acting or doing").

[14] *See* The Am. Heritage Coll. Dictionary 359 (3d ed. 1993). Importantly, the definitions implying a process are listed first and second, and it is not until the third definition that

This interpretation, moreover, is in harmony with the closest existing Fourth Circuit authority. In *Lee v. U.S. Citizenship & Immigration Servs.*, 592 F.3d 612, 620 (4th Cir. 2010), the Fourth Circuit concluded that a district court lacked subject matter jurisdiction to review a challenge to the denial of an application for adjustment of status under 8 U.S.C. § 1255(i). Unlike the instant case, the denial in *Lee* fell under § 1252(a)(2)(B)(i), which bars judicial review of "any judgment regarding the granting of relief under section…1255" of title 8. Yet, just like an "action" and a "decision," a "judgment" is understood in the ordinary course of usage to entail the entirety of a process.[16] Indeed, it is clear from the Fourth Circuit's analysis that a "judgment" sweeps more broadly than a final decision, as the Fourth Circuit concluded that district courts lack subject matter jurisdiction under § 1252(a)(2)(B)(i) to review challenges to an eligibility determination, a determination that necessarily precedes the denial of an application for adjustment of status, which is the discretionary decision. *See Lee*, 592 F.3d at 620. Accordingly, the Fourth Circuit's analysis in *Lee* suggests that § 1252(a)(2)(B)(i) must be understood to protect decisions necessarily made as part of the process of reaching the ultimate, discretionary

---

"decision" is defined as "[a] conclusion or judgment reached or pronounced," which implies a mere result. *Id.* This is significant because the dictionary referenced arranges definitions "with the central and often the most commonly sought meanings first." *Id.* at xxv. Thus, a fair inference is that understanding a "decision" as a process rather than just a result is the more "ordinary, contemporary, [and] common meaning." *Perrin*, 444 U.S. at 42.

[15] It bears reiteration here that to "determine[]," the term used in § 1154(a)(1)(A)(viii)(I), is linguistically coextensive with "to decide." *See supra* n.12 and accompanying text.

[16] *See* The Am. Heritage Coll. Dictionary 735 (3d ed. 1993) (defining "judgment" as "[t]he act *or process* of judging; the formation of an opinion after consideration or deliberation") (emphasis added).

decision. That holding is consistent with the conclusion reached here that a "decision" similarly covers the entire necessary *process* of deciding.[17]

The foregoing analysis points persuasively to the conclusion that § 1252(a)(2)(B)(ii) strips courts of jurisdiction to review both the ultimate decision that is discretionary and the steps that are a necessary and ancillary part of reaching the ultimate decision. The Supreme Court's *McNary* decision is not to the contrary. The challenged aspects of the process in *McNary* over which the Supreme Court held federal courts had jurisdiction to conduct review were not *necessary* to the ultimate discretionary determination. Specifically, the plaintiffs in *McNary* challenged how interviews were conducted. *See* 498 U.S. at 487-88. No one particular means by which an agency conducts interviews for the purpose of collecting evidence can be said to be necessary to the making of a discretionary determination; an agency can collect evidence in any number of ways that will allow a final decision to be made. In contrast, weighing evidence is a necessary step in making the discretionary determination, as the weighing of evidence is how a conclusion is reached.

Thus, because the USCIS's "no risk" determination in this case was reached via an exercise of discretion expressly reserved by statute to the Secretary of Homeland Security, there is no subject matter jurisdiction to review either the decision itself or the weighing of the evidence employed in reaching the decision, as the weighing was a necessary and prior step towards reaching the final determination. To conclude otherwise would strip § 1252(a)(2)(B) of

---

[17] One might plausibly argue that the words "judgment," "action," and "decision" should not all be interpreted as reaching the process leading to the conclusion as this creates redundancy. But it is no less plausible, in light of the ordinary meanings of the terms employed, that Congress meant to use multiple broad terms for the sake of exhaustively illustrating the point that courts should not review the decisions that are necessarily prior to ultimate discretionary determinations.

its intended effect by permitting federal courts to second-guess discretionary determinations in all but name. Accordingly, the USCIS's motion to dismiss plaintiffs' APA § 706(2)(A) claim for lack of jurisdiction must be granted.

The statutory analysis just articulated with regard to plaintiffs' APA § 706(2)(A) claim is similarly dispositive of plaintiffs' APA § 706(2)(C) challenge to the use of a beyond a reasonable doubt standard of review. The weighing of individual pieces of evidence cannot yield a final result if one does not know how much weight is necessary to reach a conclusion. In light of this reality, the Secretary of Homeland Security has established, via the Aytes Memorandum, that discretion should only be exercised in favor of making a "no risk" determination if there is evidence sufficient to conclude beyond a reasonable doubt that a petitioner poses no risk to his beneficiary.

Plaintiffs argue that because the beyond a reasonable doubt standard is a broadly applicable practice and not part of an individualized determination, *McNary* renders it subject to judicial review. But, as discussed *supra*, *McNary* does not stand for the proposition that all generally applicable agency practices are subject to judicial review; rather, *McNary* is properly understood as permitting review of only those agency practices that are not necessary to the discretionary decision. Because a "no risk" determination under § 1154(a)(1)(A)(viii)(I) cannot be made without both (i) weighing the evidence and (ii) knowing how much evidentiary weight is required to justify an exercise of discretion in favor of a petitioner, the burden of proof is a necessary part of the determination. There is no sound basis to suggest that this is any less true simply because the Secretary of Homeland Security sets a uniform burden of proof across all applications. *Accord Spencer Enters., Inc. v. United States*, 345 F.3d 683, 691 (9th Cir. 2003) ("Under § 1252(a)(2)(B)(ii)…if the statute specifies that the decision is wholly discretionary,

16

regulations or agency practice will not make the decision reviewable."). Because the burden of proof, like the weighing of evidence, is a necessary component in formulating a discretionary determination, § 1252(a)(2)(B)(ii) withdraws subject matter jurisdiction to review the burden employed. As such, the motion to dismiss plaintiffs' APA § 706(2)(C) challenge to the burden of proof must be granted.[18]

Finally, the analysis turns to considering whether § 1252(a)(2)(B)(ii) similarly strips jurisdiction to review plaintiffs' APA § 706(2)(C) challenge to the USCIS's application of the AWA to petitioners with adult beneficiaries. It does not. Unlike the weighing of evidence or the imposition of a specific burden of proof, the decision to apply the AWA to petitioners with adult beneficiaries is not necessary to making a final discretionary determination. Indeed, the need to make a discretionary determination arises only if the AWA applies. Thus, determining whether the AWA applies to petitioners with adult beneficiaries is a legal question that is analytically prior to the process of making a discretionary "no risk" determination. There is no statutory provision delegating discretion to determine the scope of the AWA's reach to the Secretary of Homeland Security. Without such an express delegation, general federal question jurisdiction remains unaffected. *See* 8 U.S.C. § 1252(a)(2)(B)(ii) (a "decision" is not reviewable only if "the authority" for the decision "is specified…to be in the discretion of…the Secretary of Homeland

---

[18] The USCIS argues in the alternative that the imposition of a beyond a reasonable doubt standard is (i) required by the language of the statute, (ii) entitled to *Chevron* deference, or (iii) entitled to *Skidmore* deference. Whether the USCIS could prevail on any of these arguments is unclear. This is particularly so with respect to the USCIS's claim that the Aytes Memorandum is entitled to *Chevron* deference, as a relatively recent series of Supreme Court decisions casts some doubt on whether such memoranda qualify for deference under *Chevron. See Christensen v. Harris Cnty.*, 529 U.S. 576 (2000) (no deference for an opinion letter); *United States v. Mead Corp.*, 533 U.S. 218 (2001) (no deference for a tariff clarification ruling); *Barnhart v. Walton*, 535 U.S. 212 (2002) (establishing that deference depends on a case-by-case inquiry of multiple factors). In any event, because there is no subject matter jurisdiction to review the imposition of a beyond a reasonable doubt standard, the question of deference is not reached or decided.

Security"). Thus, § 1252(a)(2)(B)(ii), when read in light of § 1154(a)(1)(A)(viii)(I), points convincingly to the conclusion that judicial review is *not* precluded with respect to the USCIS's decision to apply the AWA to petitioners with adult beneficiaries because that decision is not part of the "no risk" determination.

The USCIS's argument that the jurisdiction-stripping provisions of § 1252(a)(2)(B) are broader than the jurisdiction-stripping provision in *McNary*, and therefore insulate more questions and determinations from judicial review, does not alter the analysis or the conclusion reached here. The mere fact that § 1252(a)(2)(B) is written more broadly is not sufficient, in light of the foregoing textual analysis, to conclude that Congress intended to prevent judicial review of legal questions like whether the AWA applies to petitioners with adult beneficiaries. In fact, it is worth mentioning that the Supreme Court in *McNary* explicitly noted that when Congress wants to preclude judicial review of *all* legal questions it knows what language will accomplish that desired goal. *See* 498 U.S. at 494 (referencing 38 U.S.C. § 511(a), which bars review of "all questions of law and fact"). Thus, although *McNary* contemplates that a federal statute broader than the one at issue there might entirely preclude judicial review of agency action, the language of § 1252(a)(2)(B)(ii) is not broader in a way that achieves this result.

Nor does the availability of judicial review of "constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals" under § 1252(a)(2)(D) alter the conclusion reached here that district courts similarly retain jurisdiction over such questions (so long as the question at issue does not fall within the reach of § 1252(a)(2)(B)). By its plain language, § 1252(a)(2)(D) says nothing about making the courts of appeals the *exclusive* venue in which "questions of law" can be raised. Rather, § 1252(a)(2)(D) is a statutory rule of construction; it merely clarifies that courts of appeals retain jurisdiction to

18

consider questions of law on an appeal from a final order of removal. *See Lee*, 592 F.3d at 620 (noting that § 1252(a)(2)(D) "merely confirms" the authority of courts of appeal "to review constitutional claims and questions of law, but only after a final order of removal has been entered") (internal quotations omitted).

Because the USCIS's weighing of evidence and imposition of a beyond a reasonable doubt standard of proof are necessary elements of a decisional process specified as within the Secretary of Homeland Security's sole and unreviewable discretion, § 1252(a)(2)(B)(ii) prevents judicial review of plaintiffs' APA claims challenging those actions. Accordingly, those claims must be dismissed for lack of subject matter jurisdiction. In contrast, because the decision to apply the AWA to petitioners, like Struniak, who are petitioning on behalf of an adult beneficiary is an analytically prior legal question that is not specified as falling within the discretion of the Secretary of Homeland Security, review of plaintiff's APA claim attacking that decision is not foreclosed under § 1252(a)(2)(B)(ii), and the motion to dismiss this claim for lack of subject matter jurisdiction must be denied.

### III.

Although subject matter jurisdiction exists to review plaintiffs' claim under APA § 706(2)(C) that the USCIS acted in excess of statutory authority by applying the AWA to Struniak's petition on behalf of his adult wife, the USCIS alternatively moves to dismiss this claim under Rule 12(b)(6) for failure to state a claim. Specifically, the USCIS argues that the plain and unambiguous language of the AWA requires its application to all citizens convicted of qualifying offenses regardless of the age of the beneficiary. Plaintiffs argue that such a reading is at odds with the stated purpose and intent of Congress in enacting the AWA, namely to protect children.

The plain language of § 1154(a)(1)(A)(viii)(I), which limits eligibility to submit an I-130 petition, clearly and unambiguously applies to all "citizen[s] of the United States who [have] been convicted of a specified offense against a minor" unless the Secretary of Homeland Security "determines that the citizen poses no risk to the alien with respect to whom a petition" is filed. The text contains no age limitation, qualification, or requirement; it applies to any citizen who committed a qualifying offense regardless of the age of "the alien" beneficiary.

Plaintiffs seek to avoid this conclusion by raising four arguments. First, plaintiffs argue that nothing in the text or legislative history of the immigration provisions of the AWA suggests that it was intended to protect anyone other than children. This argument is plainly wrong for the reason just discussed, namely that the plain and unambiguous language of § 1154(a)(1)(A)(viii)(I) applies to all beneficiaries. There can be no doubt "that the plain language of a statute provides the best evidence of legislative intent." *Miller v. Carlson*, 768 F. Supp. 1331, 1335 (N.D. Cal. 1991). Plaintiffs' reliance on the title of the AWA provisions at issue— "Immigration Law Reforms to Prevent Sex Offenders from Abusing Children"[19]—does not alter this conclusion. Indeed, it is well settled that "arguments about purpose, history, and statutory titles cannot contradict a law's plain text." *United States v. Otuya*, 720 F.3d 183, 190 (4th Cir. 2013) (citing, *inter alia*, *Bd. of Govs. of Fed. Reserve Sys. v. Dimension*, 474 U.S. 361, 374 (1986)).[20] And finally, plaintiffs' reliance on President Bush's signing statement, which likewise emphasized the protection of children, is similarly unavailing. Presidential signing statements are

---

[19] Pub. L. No. 109-248, 120 Stat. 587, 622.

[20] A corollary of this rule is that federal judges may only rewrite the plain language of a statute to effectuate what Congress *meant*, rather than what Congress *said*, when there is clear evidence of a scrivener's error. *See* Nelson, *supra* n.11, at 390 (noting that "nearly everyone agrees that judges do have some role" in correcting scrivener's errors). Except in the clear and exceptional circumstance of a scrivener's error, Congress is left to correct its own mistakes.

rarely of use in statutory interpretation given that the president's role in the legislative process amounts to nothing more than approving or disapproving—not modifying—the bills that Congress passes. *See* Nelson, *supra* n.11, at 366. Because the president has no special insight into the meaning or intent of legislative text, his statements and opinions bear little weight in the project of statutory interpretation, the goal of which is to effectuate Congress's will as expressed in the words Congress has chosen for the laws it enacts.

Second, plaintiffs argue that § 1154(a)(1)(A)(viii)(I) should be construed so as to avoid raising a substantial constitutional question, specifically the permissibility of an infringement of the substantive constitutional right to family unification. This interpretative approach, however, is only appropriate if a statute is ambiguous and one of the permissible interpretations using the ordinary tools of interpretation avoids the constitutional question. *See United States ex rel. Attorney Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909) ("[W]here a statute is susceptible to two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."). Where, as here, the statute is unambiguous, the statute must be accepted for what it says; any constitutional questions that follow cannot be avoided by deviating from the clear language.

Third, plaintiffs cite *Judulang v. Holder*, 132 S. Ct. 476, 489 (2011), to argue that it is arbitrary and capricious to interpret a statute in a manner unmoored from the purposes and concerns of the immigration laws. In *Judulang*, the Supreme Court held that the BIA's application of a statutory provision was arbitrary and capricious. *Id.* at 479. It follows that the statute did not, as here, unambiguously require the agency to apply the provisions in the manner challenged. Indeed, the Supreme Court noted that arbitrary and capricious review is functionally identical to the second step of analysis under *Chevron U.S.A., Inc. v. Natural Res. Def. Council*,

21

467 U.S. 837 (1984), which calls for review of the reasonableness of an agency's statutory

interpretation only *after* determining whether Congress has spoken unambiguously on an issue.

*See Judulang*, 132 S. Ct. at 483 n.7. Because the statutory analysis *supra* demonstrates that the

AWA speaks clearly and unambiguously to the issue at hand, there is no need to ask whether the

USCIS's interpretation is reasonable or arbitrary.

      Finally, plaintiffs argue that the USCIS's reading relies on the assumption that Congress

acted arbitrarily. This is not true. Congress may have acted improvidently, or it may have made

an oversight in drafting, or it may have determined that a broad limit on eligibility was simply

good policy and stuck the amendment into the AWA for convenience. Or, less plausible but still

possible, perhaps Congress made a reasoned judgment that the threat of a new procedural hurdle

in the petitioning process would deter people from committing offenses against minors. Simply

put, possible explanations ranging from the likely to the absurd abound for why Congress's

language reads as it does. And even if plaintiffs are correct that the AWA's language is a mistake

that should be judicially rewritten to effectuate congressional intent, plaintiffs have not identified

"a clearly expressed legislative intention" permitting a deviation from the unambiguous text.

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). Indeed,

imagine the chaos the might ensue if, for instance, Congress enacted a tax cut for the express

purpose of stimulating the economy and in response to subsequent economic stagnation judges

began rewriting the tax code from the bench in an attempt to effectuate the economic stimulation

Congress intended. Such a scenario highlights precisely why only the clearest of intentions can

justify interpreting a statute in a manner inconsistent with its plain language.[21]

---

[21] Recent decisions of the Supreme Court in which a statute's interpretation has deviated from
the most natural reading of the pertinent text do not alter the conclusion reached here. In *King v.*

Accordingly, plaintiffs' argument that the USCIS cannot apply the AWA to petitioners with adult beneficiaries fails as a matter of law because the unambiguous statutory language clearly speaks to the contrary. Not only *may* the USCIS apply the AWA to petitioners with adult beneficiaries, but it *must*. Accordingly, plaintiffs' APA § 706(2)(C) challenge to the AWA's application to petitioners with adult beneficiaries must be dismissed for failure to state a claim.

## IV.

Plaintiffs next argue that the USCIS's application of the AWA to plaintiffs is impermissibly retroactive.[22] The presumption against retroactive legislation "is deeply rooted in

---

*Burwell*, 135 S. Ct. 2480, 2496 (2015), for example, the Supreme Court essentially interpreted "[e]xchange established by the State," as used in the Affordable Care Act, to mean "[e]xchange established by the State or the Federal Government." (Scalia, J., dissenting). But this only occurred after concluding that (i) context rendered the language ambiguous and (ii) the overall structure of the highly-integrated statutory regime indicated that a less than natural reading was appropriate. *See id.* at 2492-96. This case is not at all like *King* because the language at issue was not enacted as part of a highly-integrated statutory scheme with interdependent and interconnected provisions, as was the case with the Affordable Care Act. Similarly, in *Yates v. United States*, 135 S. Ct. 1074, 1088-89 (2015), the Supreme Court interpreted "tangible object" as used in the Sarbanes-Oxley Act to mean only tangible objects "used to record or preserve information." But this holding was exceptionally narrow and turned on the presence of three important factors: (i) the statute's use of a list of particular nouns, (ii) the statute's use of a list of particular verbs, and (iii) the statute's title. *See id.* at 1089 (controlling opinion of Alito, J., concurring in the judgment). Of these factors, plaintiffs here have only a title on which to rely, which, as discussed *supra*, is insufficient to speak with the clarity necessary to deviate from an ordinary and natural reading.

[22] Plaintiffs do not appear to argue that the AWA falls within the reach of the *Ex Post Facto* Clause, U.S. Const. art. I, § 9, cl. 3, which prohibits the imposition of punishment (or an increased degree of punishment) for conduct "which was innocent at the time it was committed." *See Calder v. Bull*, 3 U.S. 386, 400 (1798). In any event, such an argument would clearly fail, as the Supreme Court has explained that "[t]he *Ex Post Facto* Clause does not preclude [the government] from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences." *Smith v. Doe*, 538 U.S. 84, 103 (2003) (upholding an Alaska law that required any sex offender, including those convicted before the enactment of the law, to register with the state's Department of Corrections); *accord Suhail*, 2015 WL 7016340, at *8 (holding that the AWA provision at issue here is a civil matter and not a criminal penalty); *Burbank*, 2015 WL 4591643, at *6-7 (same).

our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). The framework for analyzing whether a statute applies retroactively to acts and events in suit occurring before the statute's enactment is well settled. First, the task is to identify "whether Congress has expressly prescribed the statute's proper reach." *Id.* at 280. If Congress has done so, the analysis ends and the statute should be taken for what it says. Otherwise, the task becomes identifying whether application of the statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* If an application would achieve such a result, then the traditional presumption against retroactivity applies and the statute should not be applied to the events in suit. *Id.*

Under the first step of the analysis, there is evidence that Congress intended for § 1154(a)(1)(A)(viii)(I) to apply to persons with convictions occurring prior to enactment. The plain text of § 1154(a)(1)(A)(viii)(I) instructs that the provision permitting a citizen to petition for immediate relative status "shall not apply" in the present to any citizen who "has been convicted" in the indeterminate past of a qualifying offense. This use of verb tense is instructive because in the ordinary sense of the language used, § 1154(a)(1)(A)(viii)(I) covers anyone who has been convicted at any point. *See Carr v. United States*, 560 U.S. 438, 447-48 (2010) (verb tense is significant in construing statutes). Moreover, in *Carr* the Supreme Court concluded that a different portion of the AWA—a provision relating to sex offender registration—did *not* apply retroactively in part because the statutory language was entirely present tense. Specifically, the provision at issue in *Carr* regulated any sex offender who "travels in interstate commerce" and "knowingly fails to register," which the Supreme Court concluded covered only post-enactment travel. *Id.* at 442, 458. Because Congress enacted § 1154(a)(1)(A)(viii)(I) simultaneously with

the provision at issue in *Carr* and used different verb tenses in the two provisions, it is proper to presume (i) that Congress was aware of its use of language and (ii) that its use of language was intentional. Thus, if the present tense indicates a non-retroactive application, the choice of a backwards-pointing tense, as used in § 1154(a)(1)(A)(viii)(I), should reasonably mean something else, such as that the provision to should apply to convictions occurring prior to the effective date of the AWA.

Despite the foregoing, it is well settled that language indicating a retroactive application "must be express, unambiguous, and unequivocal." *Jaghoori v. Holder*, 772 F.3d 764, 770 (4th Cir. 2014). Assuming that the text of § 1154(a)(1)(A)(viii)(I) does meet that demanding standard, the foregoing textual analysis remains dispositive of the central dispute between the parties on the retroactivity question, namely what constitutes the qualifying retroactivity event. To illustrate, in plaintiffs' view § 1154(a)(1)(A)(viii)(I) attaches new legal consequences—a heightened bar to be allowed to petition for immediate relative status—to a pre-enactment conviction, which renders the provision retroactive. In contrast, the USCIS views the provision as defining the qualifications in the here-and-now for eligibility to submit a petition for immediate relative status. The plain language of the provision resolves this dispute; § 1154(a)(1)(A)(viii)(I) sets *present* qualifications by defining eligibility to petition for immediate relative status. *See* 8 U.S.C. § 1154(a)(1)(A)(viii)(I) (the provision permitting a citizen to petition for immediate relative status "shall not apply" in the present to any citizen who "has been convicted" of a qualifying offense in the indeterminate past). Moreover, the stated purpose of the AWA reinforces this conclusion.[23] As expressed by Congress, the various provisions of the

---

[23] The purposive analysis conducted here is not in tension with the rejection of a purposive analysis, *supra* Part III, in construing the language of § 1154(a)(1)(A)(viii)(I) to reach *all*

AWA are intended, *e.g.*, to "protect children" (in the present) and to "protect the public from sex offenders" (also in the present). *See* 120 Stat. 587; 42 U.S.C. § 16901.

Congress's use of language and stated purpose place the AWA provision at issue here squarely within the category of non-retroactive laws that "address dangers that arise postenactment." *See Vartelas v. Holder*, 132 S. Ct. 1479, 1489 n.7 (2012). In *Vartelas*, the Supreme Court distinguished a law that "prohibit[s] sex offender[s] with a history of child molestation working in close proximity to children" from a law that prohibits foreign travel by lawful permanent residents with convictions such as conspiring to make a counterfeit security. *See id.* at 1483, 1489 n.7. The former law is non-retroactive precisely because it regulates a present harm or risk, which the latter law, in the Supreme Court's view, does not. *See id.* Here, there can be no doubt that § 1154(a)(1)(A)(viii)(I) is non-retroactive under *Vartelas*—(i) the statute is plainly drawn to determining that a qualifying offender poses "no risk" to a beneficiary in the present, (ii) the language in the ordinary sense of usage suggests that a qualifying conviction could have occurred at any point in the indeterminate past, and (iii) Congress's expressly stated purpose is protecting people in the present. *Accord Reynolds v. Johnson*, No. 12-cv-55675, 2015 WL 9584386, at *1 (9th Cir. Dec. 31, 2015) (holding that § 1154(a)(1)(A)(viii)(I) falls within the category of non-retroactive laws identified in *Vartelas*).

Plaintiffs argue that this case is not like the illustrative example in *Vartelas* because § 1154(a)(1)(A)(viii)(I) is not drawn to preventing offenders who committed an offense against children from interacting with children. Rather, § 1154(a)(1)(A)(viii)(I) prohibits such offenders

---

petitioners with a qualifying conviction regardless of the age of the beneficiary. Although "arguments about purpose…cannot contradict a law's plain text," there is no reason arguments about purpose cannot, as here, support conclusions about a law's plain text. *See Otuya*, 720 F.3d at 190.

from petitioning on behalf of *anyone* absent a "no risk" finding. This argument fails in that it reads *Vartelas* too narrowly. *Vartelas* does not stand for the proposition that a regulation to protect people in the present must be narrowly tailored to the exact contour of the threat presented by pre-enactment conduct in order to be non-retroactive. Indeed, another illustrative example from *Vartelas* proves this point. As the Supreme Court explained, a law that prohibits a person who has been committed to a mental institution from possessing a firearm is not retroactive because it addresses a present harm. *See Vartelas*, 132 S. Ct. at 1489 n.7. This is so even though many of the people committed to a mental institution may have never misused a firearm; Congress has all the same determined that the fact of commitment, whenever it occurred, indicates a danger of misusing firearms that must be regulated. The same is true with respect to § 1154(a)(1)(A)(viii)(I), as Congress is free to conclude that an offender who committed crimes against children, whenever those crimes were committed, also poses a present harm to adults. Indeed, the Supreme Court's point in *Vartelas* was that the provision before the Supreme Court there had *no* relationship to a regulation of a present danger whereas other laws might. Because text and purpose indicate that § 1154(a)(1)(A)(viii)(I) regulates a congressionally identified present danger, *Vartelas* teaches that the law's application to offenders based on pre-enactment conduct is not retroactive.

Plaintiffs' cited authorities do not compel a contrary conclusion. In *INS v. St. Cyr*, 533 U.S. 289, 293 (2001), the respondent was convicted of a controlled substance violation under an immigration law regime that made him deportable, but that also made him eligible for a waiver of deportation at the Attorney General's discretion. Between the time of the conviction and the time removal proceedings began, Congress amended the law, repealing the provision allowing for discretionary relief. *See id.* The Supreme Court held that the repeal of discretionary relief

27

should not be applied retroactively to aliens who would have been eligible for such relief at the time of conviction. *See id.* at 326. This holding is not inconsistent with *Vartelas* in that the provision at issue in *St. Cyr* was not designed to regulate a present danger. Moreover, the reasoning in *St. Cyr* focused in substantial measure on the concept of reliance. That is, the Supreme Court was particularly troubled by the fact that the respondent in *St. Cyr* had accepted a plea agreement with the settled expectation that doing so would preserve the possibility of a discretionary waiver of deportation only to discover later that Congress eliminated the possibility of such relief for people who entered into plea agreements. *See id.* at 321-22. This concern is not present in the instant case, as Struniak makes no allegation that he cut a plea deal with the Commonwealth of Pennsylvania with the settled expectation that doing so would preserve his right to petition for an adult beneficiary in federal immigration proceedings.

Plaintiffs' reliance on the Fourth Circuit's decision in *Jaghoori* similarly fails. As in *St. Cyr*, the Fourth Circuit in *Jaghoori* reasoned that the lawful resident alien seeking to avoid deportation had a vested right to discretionary relief prior to the enactment of an amendment that "would render such relief an impossibility." 772 F.3d at 771. Again, unlike in *Vartelas*, the provision at issue in *Jaghoori* was not aimed at resolving a present threat of harm. Moreover, both *St. Cyr* and *Jaghoori* addressed changes to *substantive* rights, namely the right to remain in the United States. In other words, the repeal of the possibility of discretionary relief in both *St. Cyr* and *Jaghoori* eliminated the possibility that the resident aliens opposing removal could prevail. In contrast, § 1154(a)(1)(A)(viii)(I) is a procedural rule that simply imposes an additional step—the "no risk" finding—before covered offenders can submit their petitions.[24] It

---

[24] Plaintiffs argue that the allegation in their Complaint that obtaining discretionary relief under § 1154(a)(1)(A)(viii)(I) is practically unachievable must be accepted and true, which plaintiffs

defies commonsense to suggest that a citizen reasonably relies on settled expectations about a specific bureaucratic petitioning procedure to the same extent that lawful resident aliens who enter the United States reasonably rely on their settled expectations about how they must conform their conduct for many years in order to qualify to remain in the country. *See Jaghoori*, 772 F.3d at 771 (citing *St. Cyr* for the proposition that retroactivity analysis "demands a commonsense, functional judgment" that "should be informed and guided by 'familiar considerations of fair notice, reasonable reliance, and settled expectations'").

As the foregoing analysis demonstrates, the correct disposition of plaintiffs' retroactivity challenge is to join the chorus of courts that have held that the application of § 1154(a)(1)(A)(viii)(I) to petitioners whose convictions occurred prior to enactment is not impermissibly retroactive. *See Reynolds*, 2015 WL 9584386, at \*1; *Suhail*, 2015 WL 7016340, at \*8; *Burbank*, 2015 WL 4591643, at \*6-7. Accordingly, the USCIS's motion to dismiss plaintiffs' retroactivity challenge for failure to state a claim must be granted.

## V.

Plaintiffs' final argument is a constitutional attack alleging that the USCIS's denial of plaintiffs' I-130 petition under the AWA impermissibly interferes with Struniak's constitutionally protected liberty interest in marriage. In essence, plaintiffs argue that the AWA's imposition of a burden on married adult spouses unconstitutionally infringes on the substantive due process right of married persons to engage in family life.[25] Although the USCIS contends

---

suggest renders § 1154(a)(1)(A)(viii)(I) more like a substantive disability than a procedural hurdle. This argument fails; plaintiffs' allegation in this respect is "conclusory and not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

[25] It appears from the face of the Complaint that plaintiffs are challenging the AWA provision at issue here as substantively unconstitutional as applied rather than challenging the denial of the

that this argument is foreclosed by the Supreme Court's recent decision in *Kerry v. Din*, 135 S.

Ct. 2128 (2015), plaintiffs argue that the right they assert has a foundation in the Supreme

Court's even more recent decision in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).

Plaintiffs are correct in that *Kerry* does not resolve the instant dispute. In *Kerry*, the

plaintiff argued that the denial of her non-citizen husband's visa application deprived her,

without due process of law, of her constitutionally protected liberty interest in living in the

United States with her spouse. 135 S. Ct. at 2131. Specially, the plaintiff argued that the denial of

the visa application without adequate explanation violated the Due Process Clause of the Fifth

Amendment. *See id.* at 2131-32. The Supreme Court, speaking through a plurality opinion, ruled

against the plaintiff on the ground that there was no constitutionally protected liberty interest in

living in the United States with one's spouse. *See id.* at 2135. As the Supreme Court plurality

explained,

> Nothing in the cases [the plaintiff] cites establishes a free-floating and categorical
> liberty interest in marriage…sufficient to trigger constitutional protection
> whenever a regulation in any way touches upon an aspect of the marital
> relationship. Even if our cases could be construed so broadly, the relevant
> question is not whether the asserted interest 'is consistent with this Court's
> substantive-due-process line of cases,' but whether it is supported by 'this
> Nation's history and practice.'

*Id.* (citing *Washington v. Glucksberg*, 521 U.S. 702, 723-24 (1997)). Thus, the

plurality concluded that "a long practice of regulating spousal immigration precludes [the

plaintiff's] claim that the denial of [her husband's] visa application has deprived her of a

fundamental liberty interest." *Id.* Justice Kennedy, with whom Justice Alito joined, concurred

---

petition as a deprivation of liberty without due process. *See* Comp. ¶ 58. This distinction is not
material for present purposes because the underlying liberty interest asserted is not protected by
the Constitution as judicially enforceable, as discussed *infra*. Accordingly, plaintiffs' claim fails
under either a substantive or procedural due process analysis.

in the judgment on narrower grounds. According to Justice Kennedy, *assuming* the plaintiff had a constitutionally protected liberty interest of the type asserted, the notice she received with respect to the denial of her husband's visa application was sufficient to satisfy due process. *Id.* at 2139 (Kennedy, J., concurring in the judgment). The remaining justices concluded that the plaintiff should prevail on her constitutional claim. *See id.* at 2142 (Breyer, J., dissenting). Thus, *Kerry* did not produce a majority position on the question whether a citizen has a constitutionally protected and judicially enforceable liberty interest in residing in the United States with his or her non-citizen spouse.

Plaintiffs seize on this open question and argue that in light of *Obergefell* there is constitutionally protected liberty interest of the type asserted in *Kerry*. The USCIS responds that *Obergefell* addresses a wholly distinct question, namely whether a state may, consistent with the Constitution, deny a marriage license to two consenting homosexual adults. Although the USCIS is correct that *Obergefell* only addresses that specific issue, such an argument misses plaintiffs' broader point, which is that *Obergefell* has changed the way in which courts are to analyze substantive due process claims. Indeed, plaintiffs argue that the reasoning of the *Kerry* plurality, which was rooted in historical practice, is no longer appropriate. Thus, plaintiffs' constitutional challenge raises two issues: (i) whether, and how, *Obergefell* changes the methodology for conducting substantive due process analysis and (ii) whether, under the appropriate analysis, plaintiffs have asserted a constitutionally protected and judicially enforceable liberty interest.

It is well settled, albeit still somewhat controversial,[26] that the Due Process Clauses of Fifth and Fourteenth Amendments protect certain "fundamental" liberty interests to the extent

31

that these liberties can be limited only through a regulation that is narrowly tailored to serve a compelling state interest. *See Kerry*, 135 S. Ct. at 2133 (plurality opinion). To be sure, the Constitution expressly acknowledges the existence of un-enumerated rights. *See* U.S. Const. amend. IX ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."). As such, the pertinent question is not whether these rights *exist* but whether and to what extent these un-enumerated fundamental rights are *judicially enforceable*.[27]

The Supreme Court has gradually expanded the scope of fundamental liberty interests that receive judicial protection under the Due Process Clauses.[28] The difficulty in this endeavor has been to articulate a principled and disciplined method of analysis to differentiate the judicially enforceable un-enumerated liberty interests from the non-judicially enforceable liberty

---

[26] *See, e.g., Kerry*, 135 S. Ct. at 2133 (plurality opinion) (criticizing the "doctrine of implied fundamental rights" as "textually unsupportable").

[27] As Justice Scalia has explained, "the Constitution's refusal to 'deny or disparage' other rights is far removed from affirming any one of them, and even further removed from authorizing judges to identify what they might be, and to enforce the judges' list against laws duly enacted by the people." *Troxel v. Granville*, 530 U.S. 57, 91 (2000) (Scalia, J., dissenting). In this respect, although it is "entirely compatible with the commitment to representative democracy set forth in the founding documents to argue, in legislative chambers or in electoral campaigns, that the State has *no power* to interfere with" certain fundamental rights, it does not follow that judges have the power "to deny legal effect to laws that (in [their] view) infringe upon what is (in [their] view)" a fundamental right. *Id.* at 91-92 (Scalia, J., dissenting).

[28] *See, e.g., Meyer v. Nebraska*, 262 U.S. 390, 400 (1923) (right to direct the upbringing of one's children); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925) (same); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (right to procreate); *Rochin v. California*, 342 U.S. 165, 172-73 (1952) (right to bodily integrity); *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965) (right to use contraception); *Loving v. Virginia*, 388 U.S. 558, 578 (1967) (right to marry); *Eisenstadt v. Baird*, 405 U.S. 438, 443 (1972) (right to use contraception); *Roe v. Wade*, 410 U.S. 113, 153 (1973) (right to procure an abortion); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 845-46 (1992) (same); *Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (right of sexual intimacy between consenting adults).

interests. Over the course of many decades, two equal but inapposite lines of precedent have emerged from the Supreme Court's jurisprudence on that very point. The older of the approaches is, in essence, a sort of common law constitutionalism first articulated by Justice Harlan. In his dissent in *Poe v. Ullman*, 367 U.S. 497, 543 (1961), Justice Harlan advocated a methodology that balances private interests against social needs by reference to, but not bound by, historical practice.[29] This methodology was embraced by a majority of the Supreme Court in *Casey*, 505 U.S. at 848-49, in which the Supreme Court ultimately balanced private and state interests to conclude that a state regulation on a woman's ability to procure an abortion "reach[es] into the heart of the liberty protected by the Due Process Clause" only where the regulation "imposes an undue burden." *Id.* at 874 (plurality opinion).

On the other hand, a more restrictive and historical-focused approach was articulated in *Glucksberg*, 521 U.S. at 721, in which the Supreme Court held that a judicially enforceable implied fundamental liberty interest must be (i) deeply rooted in the nation's history and traditions and (ii) implicit in the concept of ordered liberty. The *Glucksberg* majority further stressed that fundamental liberty interests must be defined with specificity and should generally be framed as negative liberties rather than positive rights. *See id.* at 719-21.

Plaintiffs are correct to assert that *Obergefell* represents a significant departure from the *Glucksberg* methodology. In fact, Chief Justice Roberts made this very observation. *See Obergefell*, 135 S. Ct. at 2621 (Roberts, C.J., dissenting) ("[T]he majority's position requires it to effectively overrule *Glucksberg*."). Moreover, the *Obergefell* analysis establishes an important

---

[29] For Justice Harlan, liberty was "a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints,…and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment." *Poe*, 367 U.S. at 543 (Harlan, J., dissenting).

proposition not present under the *Glucksberg* analysis: "The Due Process Clause and the Equal Protection Clause are connected in a profound way, though they set forth independent principles…This interrelation of the two principles furthers our understanding of what freedom is and must become." *Id.* at 2602-03. That is, *Obergefell* explicitly establishes that the principles of liberty and equality are "interlocking" and that these concepts "lead[] to a stronger understanding of the other."[30] *Id.* at 2603-04. Specifically, the *Obergefell* methodology highlights that the decision to recognize an implied fundamental liberty interest as judicially enforceable turns, in part, on whether the liberty interest at issue has historically been denied on the basis of impermissible animus or, alternatively, on a legitimate basis aimed at protecting a vulnerable group. *See, e.g., id.* at 2596 (discussing the significance of the fact that for many years "many persons did not deem homosexuals to have dignity in their own distinct identity" and that "the argument that gays and lesbians had a just claim to dignity was in conflict with both law and widespread social conventions").

In a certain respect, *Obergefell*'s doctrinal articulation of the interlocking nature of liberty and equality assists in harmonizing a series of the Supreme Court's previous cases. Simply put, *Obergefell* explains why—or is at least consistent with—the Supreme Court's willingness to recognize constitutionally protected and judicially enforceable implied fundamental liberty interests when the person asserting the right has been denied a liberty based on animus or moral condemnation, but not when the denial is rooted in a desire to protect the vulnerable. For example, in *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 281 (1990), the

---

[30] To be sure, this concept was not previously foreign to constitutional law. In *Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954), for instance, the Supreme Court imported the Fourteenth Amendment's equality protections into the Fifth Amendment's due process protection as a form of constitutionally protected and judicially enforceable liberty.

Supreme Court cited the state's interest in protecting vulnerable patients when refusing to

recognize an implied, judicially enforceable fundamental liberty interest of a patient in a

persistent vegetative state to withdraw life-sustaining treatment. Later, in *Glucksberg*, 521 U.S.

at 731, the Supreme Court similarly concluded that there was no implied, judicially enforceable

fundamental liberty interest in obtaining physician-assisted suicide, similarly by reference to the

vulnerability of certain patients. And even where a judicially enforceable fundamental liberty

interest has been recognized, the Supreme Court routinely acknowledges that state regulations

with a mere incidental effect on the right can be justified by reference to permissible state

interests.[31] Thus, the Supreme Court has made it plain that the government can restrict certain

freedoms as necessary to *protect* or otherwise to further permissible interests.

    In stark contrast, where a denial of a freedom is based on mere animus or moral

condemnation, the denial of the freedom is more susceptible to constitutional attack in court.

Accordingly, in *Lawrence v. Texas*, 539 U.S. 558, 578 (2003), the Supreme Court concluded that

a statute criminalizing homosexual sodomy violated a judicially enforceable implied

fundamental liberty interest in sexual intimacy. Importantly, the reasoning of *Lawrence* suggests

that the justification for invalidating the challenged statute under the Due Process Clause as

opposed to the Equal Protection Clause turns on the history of animus towards homosexuals. *See

id.* at 571 (noting that "powerful voices...condemn homosexual conduct as immoral" but that

this does not permit "the majority [to] use the power of the State to enforce these views on the

whole society through the operation of the criminal law"). Indeed, a facially neutral statute that

---

[31] *See, e.g., Casey*, 505 U.S. at 874-75 (plurality opinion) (employing an "undue burden" test in the context of the fundamental liberty interest in procuring an abortion because "the State's interest in the potential life within the woman" justifies certain regulations); *Anderson v. Celebrezze*, 460 U.S. 780, 787-88 (1983) (recognizing the state interest in enacting election regulations that burden the judicially enforceable implied liberty interest in voting).

criminalized *all* sodomy, as opposed only to homosexual sodomy, would satisfy the Equal

Protection Clause but still pose a risk to homosexuals because of the threat of discriminatory

*enforcement*. Thus, in order to ensure that the liberty at issue was properly vindicated, it was

necessary to remove the protected conduct from the sphere of legislative regulation entirely.

Similarly, the Supreme Court in *Obergefell* articulated a judicially enforceable implied right to

marriage for consenting homosexual adults under the Due Process Clause based on the history of

discrimination against this group. *See, e.g., Obergefell*, 135 S. Ct. at 2600 (noting that persons

who are "outcast" from society "do[] not achieve the full promise of liberty"). As in *Lawrence*, if

the Supreme Court merely required *equality* with respect to access to marriage, then certain

jurisdictions could elect to continue treating homosexuals disparately under the shield of a

facially neutral policy, such as a state's complete withdrawal from the field of marriage.

The *Obergefell* methodology is thus properly understood as a rejection of the strict

requirements of *Glucksberg* and an embrace of Justice Harlan's common law approach to

implied fundamental liberty interests. *See id.* at 2598-99 (citing Justice Harlan's dissent in *Poe*).

As under *Glucksberg*, history and tradition inform the reasoning under *Obergefell*, but history

and tradition play a smaller role. *See id.* at 2598 ("History and tradition guide and discipline [the

implied fundamental liberty interests] inquiry but do not set its outer boundaries."). That is,

courts must consider not only a history and tradition of freedom to engage in certain conduct but

also any history and tradition of animus that motivates the legislative restriction on the freedom

in order to weigh with appropriate analytical rigor whether the government's interest in limiting

some liberty is a justifiable use of state power or an unwarranted or arbitrary abuse of that power.

Of course, *Obergefell* does not explicitly overrule the *Glucksberg* methodology, so two

equal but inapposite lines of cases remain. Accordingly, it is appropriate to analyze plaintiffs'

claim under both methodologies. Under *Glucksberg*, the analysis is simple and straightforward; for the reasons articulated by the plurality in *Kerry*, the nation's history and traditions establish the power of Congress to restrict immigrant presence in the United States even when the immigrant is married to a United States citizen. *See Kerry*, 135 S. Ct. at 2135-36 (recounting the history of congressional regulation of immigration and characterizing policies intended "to promote family immigration" as "legislative grace rather than fundamental right").

Under *Obergefell*, the analysis is not much more difficult. For one, the *Glucksberg* analysis remains relevant, and the long history of congressional regulation bears due consideration. Also relevant under *Obergefell* is the *absence* of a history of impermissible animus as the basis for the restriction at issue here. In this respect, Struniak asserts a constitutionally protected and judicially enforceable liberty interest in residing in the United States with his non-citizen spouse. Congress's restriction on this liberty, enacted through the AWA and effectuated through the actions of the USCIS, is based on Struniak's status as a convicted child sex offender. Unlike in *Lawrence* and *Obergefell*, the restriction on Struniak stems from his choice to engage in criminal conduct that is illegal precisely because it harms vulnerable persons. In contrast, as noted *supra* the Supreme Court concluded that the restrictions in *Lawrence* and *Obergefell* stemmed from mere condemnation of immutable characteristics. Moreover, as in *Cruzan* and *Glucksberg*, the justification for the restriction at issue here is the protection of vulnerable persons—visa beneficiaries sponsored by convicted sex offenders— rather than mere animus or disapproval. Accordingly, consistent with the logic of *Obergefell* and its predecessor implied fundamental liberty interest cases, Struniak's asserted fundamental liberty interest is not judicially enforceable under the Due Process Clause.

37

Because the constitutionally protected liberty interest that plaintiffs assert is not judicially enforceable, plaintiffs fail to state a claim for relief with respect to the constitutional challenge to the USCIS's denial of Struniak's petition under the provisions of the AWA. Accordingly, the USCIS's motion to dismiss this challenge must be granted.

## VI.

For the foregoing reasons, the USCIS's motion to dismiss must be granted in full.[32]

An appropriate order will issue.

Alexandria, Virginia
January 29, 2016

/s/
T. S. Ellis, III
United States District Judge

---

[32] Nothing in this Memorandum Opinion should be construed as an endorsement of jurisdiction-stripping statutes, the imposition of a beyond a reasonable doubt standard in the context of the USCIS's "no risk" determination, or the application of the AWA to petitioners whose convictions occurred before enactment and who seek to petition on behalf of an adult beneficiary. Rather, the analysis here is simply the application of settled legal principles to the questions presented.